IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBA

CRAIG L. SHAFER,                        §
5875 First Street N.                    §
Arlington, Virginia 22203               §
    Plaintiff,                      §
                                        §
v.                                      §      Civil Action No. _____
                                        §
SALLY JEWELL, Secretary,                §
U.S. DEPARTMENT OF THE INTERIOR,        §
    Defendant.                      §

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff Shafer had a distinguished career as an Ecologist with the National Park Service (NPS), where, among other things, he served as national manager for the National Natural Landmarks (NNL) program. When he stepped down and later became a regional coordinator (to have more time to help his ailing parents), his former mentee Margi Brooks, a younger, female staff member, replaced him as the national program manager.

When Shafer complained to his then-first-line supervisor about her treatment of males, Brooks responded by speciously insisting Shafer tell her why he had claimed she "hated men." She later used his offer to help another regional coordinator with site visits to instead divert his travel budget away. She then persuaded their new first line supervisor that Shafer should receive a failing rating for not meeting a job element of visiting 1/3rd of the NNL sites in his region "as funding permitted." Brooks also emailed their supervisor that prior EEO activity by Mr. Shafer was "silly" and a waste of time.

Brooks emailed their colleagues that Shafer was a "pain in the butt," who would "never retire," and unintelligent and lazy. Former staff testify to Brooks' discriminatory conduct against older staff and having humiliated Shafer "face-to-face, in front of peers" and to management. He sues over the failing rating and asserts a constructive discharge.

## II. JURISDICTION AND ADMINISTRATIVE EXHAUSTION[1]

1.    This Court has jurisdiction because the Defendant is a federal official being sued in her official capacity and the suit raises federal questions (e.g., claims arising under the Age Discrimination in Employment Act and Title VII).

2.    5 U.S.C. § 7702 authorizes a federal employee pursuing a mixed case of discrimination and civil-service claims to file in federal district court after receipt of a Final Agency Decision (FAD), in the manner that would be allowed under Title VII of the Civil Rights Act of 1964 (e.g., 42 U.S.C. § 2000e–16 (c)) and section 15(c) of the Age Discrimination in Employment Act of 1967 (29 U.S.C. § 633a (c)).

   2.1.    Suit is filed within 30 days of Plaintiff Shafer's receipt of the FAD.

3.    As to the matters that were pending before the EEOC Office of Federal Operations (OFO), those have been pending since around August 18, 2012 without a decision being issued and so now may be pursued in federal district court.

   3.1.    By copy of this complaint, the EEOC Office of Federal Operations is notified that Plaintiff Shafer is terminating his pending appeal there in favor of raising the same issues as part of this suit.

   3.2.    The claims were administratively processed under DOI #NPS-10-0072, EEOC case #570-2011-00305X, and EEOC OFO Appeal #0120123243.

---

[1] Assertions in this pleading are made in addition and in the alternative to each other.

### III. PARTIES AND SERVICE

4.    Defendant SALLY JEWELL is sued in her official capacity as the Secretary of the

Department of the Interior, of which Plaintiff's former employer National Park

Service is a component.

5.    In addition to service directly on Defendant Jewell, service is being made on:

    5.1.    Attorney General Eric J. Holder, with copy also to:

    5.2.    the Civil Process Clerk for the U.S. Attorney's Office for the District of

        Columbia.

6.    Plaintiff Craig L. Shafer is an individual who resides in Arlington, Virginia.

### IV. VENUE

7.    Venue is appropriate in the federal courts of the District of Columbia because it is

where Defendant is located, where the records regarding Plaintiff's employment

would have been kept, and where Plaintiff was employed during the period at issue.

### V. CORE ISSUES

8.    Plaintiff Shafer asserts that he suffered discrimination on the basis of age (over

40), reprisal (EEO activity protected by Title VII), or both, when:

    8.1.    for the first time in more than 40 years of federal service, he received a

        failing ("unsatisfactory") failing rating; and

    8.2.    he was constructively discharged.[2]

---

[2] Plaintiff recognizes that his burden on the constructive discharge claim is not an easy one. *See,* e.g., *Ward v. McDonald*, 762 F.3d 24, 35-36 (D.C. Cir. 2014) (assertion of constructive discharge based on discrimination must be predicated on intentional or retaliatory conduct; that is, deliberately making working conditions intolerable and seeking to drive the plaintiff out of the job) (citations omitted).

8.3.    The primary referenced EEO activity was his reporting to his then-first-line supervisor Bert Frost that Margi Brooks, who had the same supervisor, was treating males in the NNL Program less favorably than the female staff.

    8.3.1.    Additionally, the EEO Report of Investigation may be read as indicating that Shafer's first-line supervisor at the time of the rating, Beth Johnson, had planned a low, but passing, rating for Plaintiff, but after learning of his initiating the EEO process, lowered the rating to a failing ("unsatisfactory") level.[3]

        8.3.1.1.    Also in this time period, Ms. Brooks emailed Ms. Johnson to say about Mr. Shafer that, "You probably know he had an EEO complaint against [redacted] and [redacted]- it's just what he likes to do....God knows what [documents] he saved this time. I'll probably have to explain myself in a deposition again....what a silly way for busy people to have to spend time!" This earlier EEO activity provides an additional and alternative basis for EEO reprisal. Brooks' reference to it at a time when Shafer's final rating was being determined and her derision of the earlier complaint make it a potential basis for reprisal though the time passed between the earlier EEO activity and the adverse rating otherwise would be too great to assume a causal connection.

---

[3] The EEO Counselor reported Ms. Johnson describing the rating as minimally successful. But then the final version was presented to Plaintiff Shafer as unsatisfactory (i.e., failing).

8.4.   Among the Defendant's actions that contributed to the constructive discharge were one or more of the following:

8.4.1.   giving him his first failing performance rating in more than 40 years of federal service, related to a program he previously managed;[4]

8.4.2.   humiliating Plaintiff face-to-face, in front of peers, and to management;

8.4.3.   destroying Plaintiff's reputation, portraying him to colleagues as a bumbling, lazy, unintelligent "pain in the butt" who "will never retire";

8.4.4.   assigning Plaintiff clerical work inconsistent with his GS-13 Ecologist position and which was a poor match for his skillset;

8.4.5.   treating his offer to visit sites outside his region or share his travel budget with colleagues (who were in greater need of making in-person visits to a larger number of NNL sites) as a gracious act, then using the resulting diversion of funds to condemn him for failing to visit an adequate number of NNL sites in his region;

8.4.6.   encouraging him to retire;

8.4.7.   requiring him to complete a trip in a manner that necessitated his driving some twenty hours over two days; and

8.4.8.   issuing him a Letter of Counseling.

---

[4] A prospective federal employer often will ask applicants to supply their most recent performance appraisal. Agencies understandably hesitate to hire an applicant whose submissions reflect they were failing to meet performance goals in their last federal job.

8.4.9.  Even if some of these items individually might be insufficient to make out a constructive discharge claim, the fact that such actions were undertaken as intentional discrimination and/or in retaliation for his prior EEO activity causes them rise to that level.

9.  As to *prima facie* elements:

9.1.  Plaintiff is a member of protected groups:

9.1.1.  he was at the time of these events over age 40, and so protected by the ADEA (Margi Brooks is some nine years younger than he; his rating supervisor Beth Johnson is also younger); and

9.1.2.  he engaged in EEO activity protected by federal law, such as Title VII.

9.2.  He was subjected to adverse action by the Defendant, such as with the events described elsewhere in this complaint.[5]

9.3.  The Defendant's actions against him were motivated at least in part by his membership in the protected groups, or his membership was the "but for" cause of the actions against him.[6]

---

[5] There is no decision below of the Merit Systems Protection Board on the civil service claim (constructive discharge) to which to give deference, so all issues are to receive *de novo* review. *Cf Rand v. Geithner,* 730 F. Supp. 2d 118, 125 (D.D.C. 2010).

[6] In disagreement with courts in this Circuit, Plaintiff agrees with EEOC's Office of Federal Operations that a "motivating factor" standard applies to federal sector reprisal claims. *See Petitioner v. Jewell,* EEOC DOC 0320110050, 2014 WL 3788011, at *13 n. 6 (July 16, 2014) (internal citations and quotations omitted):

In the Commission's view, the "but for" standard...does not apply to retaliation claims by federal sector applicants or employees under Title VII or the ADEA because the relevant federal sector statutory language does not employ the "because of" language on which the Supreme Court based its holdings...These federal sector provisions contain a broad prohibition of "discrimination" rather than a list of specific prohibited practices.

10. Because the Defendant has (in earlier proceedings) offered a legitimate, non-discriminatory reason for its actions (that Plaintiff deserved the failing rating due to poor performance in not visiting a sufficient number of NNL sites in person), the analysis proceeds past the *prima facie* stage to a determination of whether there is sufficient evidence for a reasonable jury to conclude that discrimination and/or EEO retaliation was the actual basis for the Defendant's action. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

## VI. ADDITIONAL CLAIMS

### A. Plaintiff's Record of Accomplishments

11. At the time of the events at issue, Plaintiff Shafer was a GS-0408-13/10 Ecologist in the Washington, D.C. offices of the Natural Resources, Stewardship and Science Directorate (NRSS), National Park Service, U.S. Department of the Interior.

12. According to the Agency's NPS Digest "Daily Headlines," Plaintiff Shafer retired on December 31 [2009] "with more than 43 years of federal service."

13. NPS there also noted that he joined the National Park Service in 1972 as part of the National Natural Landmarks (NNL) program in Washington, continuing to serve that program and others until his retirement.

14. He further was identified as having "contributed to agency handbooks, guidelines, park system plans, reports, proposals, and policy revisions," as well as writing one book, three book chapters, and ten peer-reviewed journal articles.

15. For example, on his own he authored the book *Nature Reserves - Island Theory and Conservation Practice*, published in 1990 by the Smithsonian Institution Press, which—though on a highly-specialized topic—sold 4,700 copies.

16. He has been recognized for initiating several important conservation endeavors.

17.   His work on the NNL Program was recognized with letters of appreciation from a Director of the National Park Service and a Secretary of the Interior.

17.1.   The letter from the NPS Director reflects a handwritten notation by the Director so that it was addressed to "Craig" rather than "Mr. Shafer."

18.   He authored a Spring 2000 article—"The National Natural Landmarks Program: A progress report" in the Agency's newsletter, *Park Science - Integrating Research and Resource Management*.  The article documents how much the NNL program achieved under Shafer's direction.

18.1.   He was identified there as being the person who "coordinates the National Natural Landmark Program from the NPS Washington Office."

19.   Herbert ("Bert") Frost was Plaintiff's immediate supervisor, but after a promotion, became his second-line supervisor, with Beth Johnson serving as the first-line supervisor for the rating at issue in this suit.

20.   Beth Johnson was Shafer's first-line supervisor for only six months, which she judged to be long enough for her to issue him a failing rating.

21.   Frost said that he "liked Craig [Shafer]. We talked weekly and I had no animosity with him." EEO Report of Investigation (ROI) at 100 (Frost aff.).

22.   Beth Johnson confirmed that Shafer and Frost "interacted well and professional[ly]."  ROI at 93 (Johnson aff.).

23.   Bert Frost testified to his understanding that, before he had arrived, Plaintiff Shafer had been the national manager [of the NNL program], but had moved out of the position by mutual agreement with management, because Shafer "didn't want to manage the national program anymore and he moved into this regional position." (Frost at 7:18 - 8:4.)

24.   The stepping down was related to Plaintiff's need to care for his ailing parents. *See*, e.g., ROI at 106 (Shafer acknowledging his parents' health issues contributed to decision to step down from serving as NNL Program Manager).

25.   Another regional NNL coordinator, Michael James Gallagher, testified in a statement to having worked with Mr. Shafer for 31 years until Gallagher's retirement and being in "continual contact."

26.   While unaware of the disputes between Brooks and Shafer, Gallagher described Shafer as "always sincerely interested in the NNL program and helpful. His work is always thoughtful and accurate."

27.   The failing rating of record for FY 2009 was the first he had received in his lengthy federal career. (Shafer at 47:13-14.)

### B. Margi Brooks' Skewed View of Mr. Shafer

28.   Though the 2000 agency publication above identified Mr. Shafer as the national coordinator of the NNL program and Mr. Frost as above testified Shafer had managed the program, Margi Brooks (subsequent coordinator for the program) refused to acknowledge this.

29.   She claimed that Shafer did not manage it, but instead had merely served as the Washington staff for it. (Brooks at 7:12-22.)

30.   In spite of his ten peer-reviewed articles and his Smithsonian-published book on conservation, Mr. Shafer was considered by Ms. Brooks to be professionally lacking.[7]

---

[7] Since leaving the agency, Plaintiff Shafer additionally has earned a Ph.D.

31.     For example, Ms. Brooks described Mr. Shafer in emails to their colleagues with language such as:

     31.1.   "incapable of thinking";

     31.2.   "What a goofball";

     31.3.   "such a pain in the butt";

     31.4.   "such a goofball";

     31.5.   someone who "will never retire"; and

     31.6.   "just so ODD!"

     31.7.   Brooks also asked their supervisor if Shafer's position could be eliminated.

32.     Given examples of Ms. Brooks' use of such language about Mr. Shafer, Mr. Frost in deposition seemed surprised, responding that "I've never heard her or seen anything that's like that from Margi [Brooks] (Frost at 17:22 - 18:5).

33.     In one email, Brooks went so far as to identify Mr. Shafer with a second older employee as "exceptions and they are big exceptions" to "most of the NNL staff" being "great, intelligent, hard-working, responsible and then some."

     33.1.   When confronted in deposition with that email, Brooks had to back-track, admitting that Plaintiff Shafer was "certainly intelligent, certainly hard working..." (Brooks at 45:11-20).

34.     William J. Schreier worked for the Park Service for 28 years, retiring in 2005 as the Intermountain Regional National Natural Landmarks Coordinator for the states of Montana, Wyoming, Colorado, and Utah.

35.     Mr. Schreier recalled "a number of negative conversations" with Brooks "regarding any and all males that had gray hair or had been in the NPS longer than her," as well as comments directly critical of Shafer.

36. Janet Dawn Eckhoff, Ph.D., an NNL staff person who had been a regional coordinator since 2001, testified she observed Margi Brooks treating Mr. Shafer "disrespectfully and in a manner indicative of verbal, mental, and emotional abuse including bullying, degrading, shaming, embarrassing, blaming, and accusatory incompetence."

    36.1.  This mistreatment by Brooks of Shafer, testified Ms. Eckhoff, took place "face-to-face, in front of peers, and behind [his] back to peers, supervisor, and higher-up supervisors..."

    36.2.  Ms. Eckhoff contrasted this with the more favorable treatment that Ms. Brooks demonstrated toward "young, female regional coordinators."

    36.3.  Ms. Eckhoff further described observing Ms. Brooks mistreating three long-time NNL program employees, one of whom was Craig Shafer, with each of the three older men retiring earlier than they had planned.

    36.4.  This was contrasted with how Ms. Brooks socialized with and showed some respect to the NNL regional coordinators who were primarily young and female, going so far as to vacation in Italy with some of them.

### C. Shafer's Earlier EEO Activity

37. Bert Frost recalled Plaintiff Shafer expressing concern to Frost about Margi Brooks having problems getting along with male coworkers as compared to female coworkers; "he had mentioned that more than once to me."  (Frost at 19:1-6).

38. Ms. Brooks was "surprised" to learn of this, exaggerating the situation as being that "Bert had called me and said that Craig [Shafer] had been in his office and was complaining that Margi hates men." (Brooks at 24:7-12.)

39.   Asked if he had told Ms. Brooks that Mr. Shafer thought she hated men, Bert Frost testified, "No," explaining that instead he (Frost) merely relayed to Brooks that "Craig thinks you don't like working with men" and that the two of them should work it out.  (Frost at 20:2-9.)

40.   Plaintiff Shafer has explained that, to him, "and to some other observers with ample experience, the females in the NNL Program seemed to fare better than the males [under Margi Brooks' running of the program]." ROI at 110 (Shafer rebuttal statement).

41.   Plaintiff's memory of one conversation with Bert Frost about the EEO concerns involving Brooks (not relating well to men) was that it took place in February 2009 (Shafer at 126:19 - 127:1).

42.   It was in a June 11, 2009 email that Ms. Brooks had asked Beth Johnson (by then their shared first-line supervisor), "Would it be possible to eliminate his position?"

43.   The February 2009 date for the conversation between Shafer and Frost about Ms. Brooks treating males less favorably may be compared to the approximate July 28, 2009, date on which Ms. Brooks diverted Plaintiff's travel budget away to another regional coordinator.

44.   Ms. Brooks responded by email that day to his Shafer's offer to do in-person visits in other regions that, "instead of you doing Deb's site visits, I think Deb should do them on our money." ("Deb" was the coordinator for another of the NNL regions.)

### D. The Failed Rating and NNL Site Visits

45.   Per the standard instructions on the annual appraisal form for Plaintiff Shafer, failure on any critical element required failure overall.  ROI at 307 (Tab G-5B).

46.     Plaintiff Shafer ultimately received a score of "0" ("Unsatisfactory") for element 1
        and thus an overall "unsatisfactory" (failing) rating for FY 2009.

47.     His personnel files reflect no prior rating of less than "fully satisfactory" in his prior
        four decades of federal employment.

48.     Critical element 1 in Mr. Shafer's performance evaluation involved the duty to
        "preserve park resources and organizational effectiveness," with one of four
        bulleted subgoals being "Conducts site visits for approximately one-third of
        regional NNL sites <u>as funding allows</u>." ROI at 309 (Tab G-5B) (emphasis supplied).

49.     Beth Johnson's comments for this element explained the "unsatisfactory" rating
        by noting that he only had visited (in person) one of the 45 NNL sites in his region.

50.     It also was claimed that "remaining funds were sent to another regional
        coordinator when Craig [Shafer] failed to provide the list of planned site visits to
        Margi [Brooks]."  ROI at 310 (Tab G-5B).

        50.1.   In reality, Margi Brooks had turned Plaintiff Shafer's offer to visit sites in
                another region (to help another regional coordinator) on its head, by
                (thanking him and then) diverting his travel funds away and telling the
                receiving regional coordinator to come up with a plan to spend the money.

51.     Bert Frost was asked in deposition if, previously having been Shafer's first-line
        supervisor, he objected to staff making contact with NNL sites by phone rather
        than in person (as Shafer had done for the performance period at issue).

52.     Frost answered that, "No. In fact, because of the 50 percent [budget] cut we knew
        we couldn't visit every site every three years, which was sort of what our goal was.
        And so it was -- actually, I encouraged that we actually do some by phone because

we knew we couldn't -- but we needed to have -- maintain that contact on sort of a tri-yearly basis." (Frost at 34:9-18.)

53.    Mr. Shafer was failed in his rating for not having enough in-person site visits, though he prepared 38 site-visit reports, using the telephone to gather information, and had lost his travel funds after volunteering to use them by doing in-person site visits to a help another regional coordinator.

54.    A chronological review of related emails (all 2009) confirms what happened:

54.1.    <u>May 11</u>—(First-line supervisor) Beth Johnson suggests there are better and cheaper ways than having Shafer "travel to all these [NNL] sites," such as by using Park Service staff in the nearby areas.

54.2.    <u>May 11</u>—Shafer asks Brooks how much she is making available for his site visits "this summer," noting that the previous year he was given less than what was needed to visit one third of his sites.  He also offers to visit sites in other regions if provided adequate funding.

54.3.    <u>May 17</u>—Beth Johnson writes to Margi Brooks that "Craig [Shafer] left a list of [NNL] sites on my desk" and she comments that "I also do not want Craig stacking up lots of travel comp time."

54.4.    <u>June 10</u>—Brooks emails Johnson that if "budget restricts travel, then they [NNL regional coordinators] should at least telephone the sites to keep in touch."

54.5.    <u>June 11</u>—Brooks asks Johnson by email about Shafer, "Would it be possible to eliminate his position?" App. 53.

54.6.    <u>July 13</u>—Shafer writes to Brooks that his travel would be most meaningful for gathering information he cannot access by phone if he assists with site

visits outside his region, based on consultation with "Caroline" and "Deb" (two other regional coordinators).

54.7.   July 28—Brooks emails Shafer that Brooks wants "Deb" [DeQuinzio] to do her own site visits.

54.8.   Brooks also tells Shafer, "Thank you for your kind offer, though. If she needs some help with visits, I will let her know you are available."

54.9.   The same day, Deb DeQuinzio writes to Brooks, "I will think about Craig [Shafer's] travel money" and asks if some of "Craig's funds" could be used for travel to D.C. to help someone in dealing with files.

54.10.  Margi Brooks responds to DeQuinzio that, "<u>Yes, you can use Craig's money for anything you want.  I do not really want him doing more site visits in your region, so please come up with a site visit in addition to the filing trip. That way I can just say you will use the money</u>" (emphasis supplied).

54.11.  Brooks would later tell Beth Johnson that she had to divert Shafer's travel budget to other uses because Shafer failed to sufficiently plan in advance how to spend it, yet here Ms. Brooks told DeQuinzio about that same pool of money she diverted from Shafer that, "I know you will need some time to plan and look over your budget, and that's fine, Deb."

54.11.1.   In summary, at least as early as July 28, Brooks had diverted Shafer's travel funds for use in another region, by "Deb."

54.12.  Shafer responded the same day to Brooks that "Margi- Well, the problem is that I am supposed to do a certain number of NNL site visits this summer."

54.13.  He goes on to explain that only two in his region really need in-person visits–that it would be a waste of funds as to the others. He said either he

will visit sites in his region that do not need it or he could assist Deb with visits in her region.

54.14.   <u>July 31—</u>Brooks writes to Shafer that Deb "prefers to do [the site visits] herself...I have given her permission to use the money from our account that you did not use for site visits this year."

    54.14.1.   As shown in other emails, it actually was not a matter of the preferences of Deb DeQuinzio, but rather Ms. Brooks instructing her to use the money rather than allowing Shafer to help out by conducting in-person site visits in DeQuinzio's region.

54.15.   <u>August 17—</u>Beth Johnson, Shafer's first-line supervisor, emails him asking [regarding a North Carolina site visit that he eventually visited in-person that year], "Is there a good reason why you can't visit the one site in your responsible area that needs to be visited?"

54.16.   <u>September 2—</u>Brooks writes to Deb DeQuinzio regarding a trip, "<u>It is fine to fly–remember, we are burning up Craig [Shafer's] travel funds that he did not use, also using leftover money they did not suck up for his huge salary for some reason</u>" (emphasis supplied).

54.17.   Later the same day, Brooks inaccurately writes to Beth Johnson (first-line supervisor for her and Shafer), "One really awful story is why Craig did no site visits...He said no one was available or they would not return his calls."

54.18.   Beth Johnson either did not comprehend, or chose not to acknowledge, that Shafer's offer to do visits in other regions was turned on its head by Brooks to divert his travel money away to another region as early as July 2009.

54.19.   Instead, according to Beth Johnson's affidavit (ROI at 85), she was left believing that "A lack of planning for site visits and a lack of execution until mid-September is what resulted in the money being moved at the end of the fiscal year."

    54.19.1.   The federal fiscal year runs October 1 – September 30.

    54.19.2.   This may be compared to the reality that Ms. Brooks actually diverted Shafer's travel funds away around late July 2009.

54.20.   Beth Johnson also was misled into believing that Brooks was transferring the money to someone who had plans already in place about how to use it: Shafer "was notified the funds would be given to another program coordinator who had planned their site visits."  ROI at 85 (Johnson aff.).

    54.20.1.   This may be compared to the email discussion above in which Brooks and Deb DeQuinzio looked for ways to spend Shafer's travel money, with Brooks telling her "Yes, you can use Craig's money for anything you want" and part of it ending up being used for a trip to D.C. to work on a filing project.

    54.20.2.   As well, Beth Johnson's claimed perception that Shafer lost the funds due to failure to adequately plan in advance how to spend them cannot be aligned with Margi Brooks telling the recipient of the diverted funds that she knew it would take some time to figure out how to spend the money and that was fine.

    54.20.3.   Asked how much of Shafer's diverted travel funds were used to conduct NNL site visits, Deb DeQuinzio could not say.

55.     The problem was not that Mr. Shafer was out of touch with the NNL sites in his region.

56.     In fact, he was familiar enough with them that he submitted 38 NNL inspection reports for FY 2009 based on phone interviews, "some with much detail." ROI at 112, 113.

### E. Beth Johnson's Dependence on Margi Brooks as to NNL Matters

57.     A look at the record reveals that Margi Brooks had sufficient influence over Beth Johnson to cause Johnson to fail Plaintiff Shafer on his performance element requiring "approximately" one third of his regional NNL sites to be visited "as funding permitted":

   57.1.   As late as December 14, 2009, Beth Johnson asked Brooks, "Craig says he did 41 [site visits] by phone...so is that ok or don't you want face to face?"

            57.1.1. Brooks responded, "Not OK..."

   57.2.   Consistent with Margi Brooks' influencing Ms. Johnson's view of Plaintiff Shafer's performance, Mr. Shafer's report of accomplishments for the final six months of the rating period reflects comments added in by Ms. Brooks.

            57.2.1. With such comments, Ms. Brooks persuaded Ms. Johnson that Plaintiff's explanation about his funding being diverted and his use of telephone calls to check up on NNL sites were unacceptable.

58.     Beth Johnson described Margi Brooks as the "overall decision maker for the NNL Program" (ROI at 93-Johnson aff.), noting that Brooks reviewed Shafer's "accomplishments to make sure that the work plan was being followed" (id.).

59.   Ms. Johnson acknowledged in deposition that she had to rely heavily on Ms. Brooks for feedback about how well or not Mr. Shafer was performing his duties as to the "Landmark Program" (i.e., NNL Program).

60.   Ms. Johnson contrasted this with duties where she was more familiar with the subject area and so did not need Brooks' input, such as Shafer's work on ecological projects (Johnson at 7:1-19).

61.   In her 28-30 years of service as a supervisor in the federal government, Ms. Johnson had never before failed an employee in a performance evaluation before doing so as to Mr. Shafer (Johnson at 8:10-13).

62.   While Margi Brooks was insistent that sites be visited in person, Ms. Johnson earlier had asked Shafer whether there would be some way to save money by not visiting sites in person (Johnson at 10:11-18).

63.   Beth Johnson described herself as only having been "onboard since March 23rd [2009] and had never supervised the NNL program before, so I was learning from the program manager [Margi Brooks]" (Johnson at 22:21 - 23:2).

64.   Johnson further explained her limited dealings with Shafer by noting, "I was only his supervisor for six months" (Johnson at 41:19-20).

65.   Margi Brooks thinks she would have had input into Shafer's performance standards because Johnson was a new supervisor and was trying to get a handle on exactly what Shafer's duties were.

65.1.   Brooks explained that she remembered Beth Johnson asking Brooks "a lot of questions and I sent her information. So I would guess that that's what she was using it for" (Brooks at 26:20 - 27:5).

66. Margi Brooks claimed it would have been Johnson's call as supervisor as to whether NNL site visits by Mr. Shafer had to be done in person versus by phone.

    66.1. Yet when Ms. Brooks was asked if Beth Johnson asked her if Shafer should be required to do the visits in person, Brooks testified, "I imagine at that point she probably did. And I would have said yes" (Brooks at 32:10-21).

67. Beth Johnson understandably had to rely on Margi Brooks to determine how Shafer was performing: not only was Brooks the NNL program manager, but also Johnson had (ROI at 83) three additional people beyond Shafer and Brooks reporting to her.

68. In short, Ms. Johnson appears to have served as the cat's paw for Ms. Brooks' discriminatory animus against Plaintiff Shafer for his age. As to reprisal, Ms. Johnson may have been influenced by Ms. Brooks' animus, had her own, or both.

### F. Other Indications of Improper Motive and Pretext

69. There are multiple indications that Margi Brooks' interactions with Mr. Shafer and the influence she exerted over Beth Johnson's evaluation of Shafer's performance on NNL matters were motivated by other than legitimate, non-discriminatory/non-retaliatory concerns such as managing the budget.

70. Beth Johnson was led to believe Shafer's travel budget was moved in mid-September (ROI 85, Johnson aff.), closer to the end of the fiscal year than the late July date on which the decision to move it actually appears to have been made by Brooks.

71.   In contrast to the emails revealing that Ms. Brooks diverted Mr. Shafer's funding away to be used by another regional coordinator, in deposition she testified, "No, I would not have moved it to another region to visit more sites" (38:17-18).

72.   Margi Brooks claimed in deposition she was not aware that Craig Shafer failed his performance evaluation based on the number of NNL sites visited (Brooks at 35:21 -36:3).

   72.1.   But supervisor Beth Johnson had told her in a December 9, 2009 email that she needed Brooks to provide "email or other documentation you might have" since "I have failed him on that performance element."

73.   Margi Brooks erroneously made it appear it was not her decision to reject Shafer's offer to use his travel budget for him to visit sites in another region to help the regional coordinator there:

   73.1.   Brooks testified in deposition that if the other NNL program coordinator had expressed a willingness to accept Mr. Shafer's help, it would not have been "my place to object" (Brooks at 33:18-21).

   73.2.   She had told Shafer that "I received a response from Deb on your offer to visit more sites in her region…She prefers to do them herself."

      73.2.1. But in the emails between Brooks and Deb DeQuinzio, it is clear that it is Brooks making the decision that Shafer will not visit these other sites. Brooks wrote to DeQuinzio after Shafer's offer that, "I would prefer that YOU do the site visits using Craig's $3k…there is no need to have him do visits if you can find time."

   73.3.   Consistent with this interpretation, DeQuinzio seemed hard-pressed to come up with ways to spend Shafer's travel money that Brooks was giving

her, responding "I will think about Craig's travel money" and indicating that she first had to "figure out my money situation here in the region this week…"

73.4.   As noted earlier, Brooks was so eager to have the other region spend Shafer's travel money that she told DeQuinzio, "Yes, you can use Craig's money for anything you want.  I really do not want him doing more site visits in your region…"

73.5.   Yet Brooks later claimed to Shafer that, "I received a response from Deb on your offer to visit more sites in her region. She prefers to do them herself."

74.   While first-line supervisor Johnson was left with the impression that Shafer's money had been moved because he had not adequately planned how to spend it, in the email in which Margi Brooks said the other region could "use Craig's money for anything you want," Brooks added that "I know you will need some time to plan and look over your budget and that's fine, Deb."

75.   One of the two items that Beth Johnson said she relied on in rating Plaintiff Shafer was his work plan.

75.1.   However, the work plan did not contain an absolute requirement that he visit one-third of the sites without regard to funding.

75.2.   Instead it said, "Conduct as many NNL inspections in my region as funding allows and there is a real need to do so. Conduct inspections of NNLs in other regions if the NNL Program Manager requests and she provides the funding to do so." ROI 352.

76.   The other item Beth Johnson asserted (ROI 331) she relied on for her 2009 rating of Shafer was his October 2008-2009 work summary.

76.1.   The work summary (at ROI 329) explained that he had volunteered to do site visits in Pennsylvania (i.e., another region) but that his $3,000 travel budget was sent to Boston (i.e., Deb DeQuinzio's region).

76.2.   Had Beth Johnson not received such negative and misleading input from Brooks about what had taken place with the site-visit funding, she likely would have credited Shafer's explanation and so not failed him on his rating.

77.   Prior to Margi Brooks learning of Plaintiff's reporting to their then-first-line supervisor, Bert Frost, about Shafer's concern that Brooks disfavored male colleagues, Plaintiff received positive ratings from Frost.

77.1.   This was even though Brooks already was serving as NNL Program Manager and Frost served as first-line supervisor for both Brooks and Shafer, just as Beth Johnson later would serve as first-line supervisor for both of them.

77.2.   Having supervised Mr. Shafer for a number of years, Mr. Frost was less subject to influence by Ms. Brooks in how he rated Shafer than was Ms. Johnson.

77.3.   Ms. Johnson had been the supervisor since only March 23, 2009—some six months prior to the end of the FY 2009 rating period.

### G. From a Passing to a Failing Rating

78.   Craig Shafer's impression from his October 2009 discussion with Beth Johnson about his FY 2009 rating, and an email from her that same month, was that he was receiving a "minimally successful" rating.   ROI 19, 21 (Plaintiff documentation of having received a "Level IV" "minimally successful" rating initially).

78.1.   In other words, he was going to receive the lowest rating that was still at a passing level.

79.   Plaintiff was distraught over the "minimally successful" rating as he had never in his decades of federal service received a rating of record lower than a "fully successful" (ROI 26, EEO Counseling Report).

80.   When interviewed by the EEO Counselor on December 15, 2009, Beth Johnson confirmed to the Counselor that Shafer was receiving a minimally successful rating. ROI 28.

81.   But at the December 17, 2009 meeting with Beth Johnson at which Plaintiff first saw the completed FY 2009 Appraisal form, he observed it now was a Level V ("unsatisfactory").  ROI 21 (Plaintiff notes on meeting).

81.1.   It nonetheless reflected late October signature dates for Beth Johnson as the rater and Bert Frost as the reviewing official.

82.   The final version of the form supplied for the ROI likewise shows an overall rating of "unsatisfactory" (ROI 307).

83.   The change from low, but passing, to failing caused Plaintiff to request that the wording of the issue in his complaint be amended, as "I was ultimately given an unsatisfactory performing rating (V) for that year." ROI 65 (May 25, 2010 letter to EEO office).

84.   As noted earlier, it was on December 14, 2009 that Beth Johnson had asked (App. 67) whether it was acceptable for Plaintiff to have done most of his site visits by phone rather than in person: "Craig says he did 41 by phone... so is that ok or don't you want face to face?"—a question that Beth Johnson would have needed to

resolve in her own mind *prior* to determining if he failed the related performance element.

84.1.   The purported signature date for Beth Johnson on the rating form of late October 2009 would have been well before her question in December.

85.   It was between the time when Beth Johnson on December 15, 2009 (ROI 27-28) told the EEO Counselor she was giving Mr. Shafer a "minimally successful" rating and when she on December 17, 2009 (ROI 19) presented Shafer with an appraisal form containing instead an "unsatisfactory" rating that Margi Brooks on December 16, 2009 alerted Ms. Johnson about Mr. Shafer, saying, "You probably know he had an EEO complaint against [redacted] and [redacted] - it's just what he likes to do....God knows what [documents] he saved this time. I'll probably have to explain myself in a deposition again....what a silly way for busy people to have to spend time!"

86.   Beth Johnson has claimed that she gave Plaintiff a failing evaluation because his performance justified it, more specifically because he only visited in person one of the landmark sites in his region during the fiscal year.

86.1.   The FY 2009 appraisal that is in dispute found him to be performing unsatisfactorily (score of 0 points) only for element 1, but by necessity then giving him an overall "unsatisfactory" rating per the instructions on page one of the form.  ROI at 307.

86.2.   This element number one involved visiting "approximately one-third of regional NNL sites as funding allows."  ROI at 309.

86.3.   To reach the "exceptional" level, he also would have had to assist "other regions in doing some site visits as funding permits." Id.

86.4.   The narrative (ROI at 310) explained that his performance was unacceptable because he had only visited one of his sites, using "only a small portion of the funds available," with the remaining money being "sent to another regional coordinator." The funds to make the one site visit were secured by Beth Johnson months after his travel budget was withdrawn by Margi Brooks.

86.5.   Plaintiff above demonstrated that what actually took place was that his offer to assist other regions with doing site visits was used as an excuse to transfer his travel budget to another coordinator, in a manner that left him with the impression he had done something noble rather than that he was failing to perform duties.

86.6.   As also set out earlier, another pretext for diversion of his funds was that Shafer had not planned how to spend them and it was mid-September, near the end of the budget year. But the earlier-referenced July 27, 2009 email between Brooks and another regional coordinator has Brooks telling the other region to "use Craig's money for anything you want" and that it was fine that it would take the region some time "to plan and look over your budget" to figure out how to spend the money.

## VII. DAMAGES AND RELIEF SOUGHT

87.     As a result of the actions of the Defendant, and in spite of mitigating his damages to at least the minimum extent necessary under law, Plaintiff has suffered losses justifying the granting of one or more of the following:

87.1.   equitable relief, such as a declaration that the Defendant violated Title VII and/or the Age Discrimination in Employment Act, with an order that it regularly report to the Court on efforts to avoid such conduct in the future;

87.2.   a finding that Plaintiff was constructively discharged, with an order that he be reinstated to his position, with retroactive granting of pay and benefits (less any that may have been received from other employment in the meantime);

87.3.   a finding that the failed performance rating was discriminatory and/or retaliatory, with it being voided;

87.4.   to the extent of a violation under Title VII, an award of compensatory damages and attorney fees, costs, and expenses under the Civil Rights Act; as well as lost income and benefits suffered in the past and expected in the future to the extent Plaintiff is not retroactively reappointed;

87.5.   to the extent of a violation under the ADEA, to the degree Plaintiff is not retroactively reappointed  with back pay and benefits, an award of lost income and benefits for the past and those expected for the future;

87.6.   to the extent fees and expenses are not awarded under Title VII, an award of them under the Equal Access to Justice Act; and

87.7.   costs of court, interest, and any other relief determined to be appropriate.

88.     Plaintiff requests that the Court deny Defendant relief of any kind.

## VIII. JURY REQUEST

89.     Plaintiff requests a trial by jury as to all issues not reserved by law for the court.

## IX. PRAYER

ON THESE GROUNDS, Plaintiff respectfully asks that he be granted the relief sought and that judgment be entered in his favor and against Defendant.

Respectfully Submitted,

SCHLEICHER LAW FIRM, PLLC
1227 N. Valley Mills Dr., Ste. 208
Waco, TX 76710
(254) 776-3939
(254) 776-4001 fax

1629 K Street, NW, Ste. 300
Washington, DC 20006
(202) 540-9950
(202) 683-6130 fax

By:  /s/ David R. Schleicher
     David R. Schleicher
     DC Bar No. 428001
     DavidS@ThisLawFirm.com